# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Cody H.,                                          Case No. 24-cv-03056 (PJS/ECW)

      Plaintiff,

v.                                               **REPORT AND RECOMMENDATION**

Frank Bisignano,[1]
*Commissioner of Social Security*,

      Defendant.

This matter is before the Court on Cody H.'s ("Plaintiff") Complaint seeking judicial review of a final decision by the Commissioner denying his application for Supplemental Security Income benefits under benefits under Section 1614(a)(3)(A) of the Social Security Act.  (*See generally* Dkt. 1.)  Plaintiff has filed a brief presenting for decision his request for judicial review of the final decision of the Commissioner of Social Security ("the Commissioner" or "Defendant").[2]  (*See* Dkt. 10.)  The Commissioner has filed a brief seeking dismissal of the Complaint.  (Dkt. 15.)  This case

---

[1]     The Complaint named Martin O'Malley, who was the Commissioner of the Social Security Administration when Plaintiff filed his Complaint.  (*See* Dkt. 1.)  Frank Bisignano became the Commissioner of Social Security on May 7, 2025.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Frank Bisignano should be substituted as the defendant in this suit.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]     As of December 1, 2022, Social Security Actions under 42 U.S.C. § 405(g) are "presented for decision on the parties' briefs," rather than summary judgment motions. Supplemental Rules for Social Security Actions under 42 U.S.C. § 405(g), Rule 5.

has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

For the reasons stated below, Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 10) should be denied and the Commissioner's request for dismissal of this action (Dkt. 15) should be granted.

## I.    BACKGROUND

On December 27, 2005, Plaintiff was awarded Supplemental Security Income ("SSI") benefits based on disability as a child beginning on August 1, 2005.  (R. 17, 83, 90).[3]  The primary diagnosis at that time for Plaintiff was bipolar disorder and an anxiety disorder.  (R. 83, 93.)  In August 2014, the Social Security Administration ("SSA") determined that Plaintiff, who was eleven years old at that time, was no longer disabled, but that finding was overturned by an Administrative Law Judge in January 2015, finding Plaintiff continued to be disabled, concluding that he had a learning disorder, "mental retardation," anxiety disorder not otherwise specified, oppositional defiance disorder, and attention deficit  hyperactivity disorder ("ADHD"), a combination of which functionally equaled the Listings.  (R. 84, 93-97.)

As required by law, under 42 U.S.C. § 1382c(a)(3)(H)(iii), eligibility for disability benefits was redetermined under the rules for determining disability in adults when Plaintiff attained age 18, and on September 13, 2021, it was determined that Plaintiff was no longer disabled as of September 1, 2021.  (R. 17, 118.)  This determination was

---

[3]    The Administrative Record ("R.") is located at Docket Entry 8.

upheld upon reconsideration after a disability hearing by a State Agency Disability Hearing Officer. (R. 228-255.) Plaintiff filed a written request for a hearing, and Administrative Law Judge Jennifer Smiley ("the ALJ") held a telephonic hearing, with Plaintiff's counsel present, on June 6, 2023. (R. 36-72, 256.) On July 24, 2023, the ALJ issued a decision denying Plaintiff's request for disability benefits. (R. 17-29).

As noted above, Section 1614(a)(3)(H) of the Act provides that individuals who are eligible for SSI benefits as children must have their disability redetermined under the rules for disability used for adults after they turn eighteen. *See* 42 U.S.C. § 1382c(a)(3)(H)(iii). When the SSA redetermines child disability after a claimant turns eighteen, it applies the standards for adult applicants, without deference to the prior disability finding and award of the child's SSI. *See* 20 C.F.R. § 416.987(a)-(b). The SSA follows the five-step sequential evaluation process under 20 C.F.R. § 416.920 for determining whether an individual age 18 or older is disabled. *See* 20 C.F.R. § 416.987(b) *see also Maximus K. v. O'Malley*, No. 23-CV-1403 (ECT/DLM), 2024 WL 3761754, at *2 (D. Minn. July 25, 2024), *R. & R. adopted*, 2024 WL 3760160 (D. Minn. Aug. 12, 2024).

At the step one, the ALJ determined that Plaintiff attained age 18 in February 2021, and was eligible for SSI benefits as a child for the month preceding the month in which he attained age 18. (R. 19.) Also at step one, the ALJ found that Plaintiff was notified that he was found no longer disabled as of September 1, 2021, based on a redetermination of disability under the rules for adults who file new applications. (R. 19.)

At step two, the ALJ determined that since September 1, 2021, Plaintiff has had the following severe impairments: bipolar disorder; ADHD; social anxiety disorder; and intellectual disability.  (R. 19.)

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (R. 19-23.)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can understand, remember, and carry out simple instructions. He can make simple work-related decisions. He can tolerate occasional changes in a routine work setting, and occasional interaction with supervisors, co-workers, and the public.

(R. 23.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that Plaintiff was capable of performing the requirements of representative occupations such as Laundry Worker (DOT #361.685-018, 95,000 jobs nationally); Kitchen Helper (DOT # 318.687-010, 170,000 jobs nationally); and Stores Laborer (DOT #922.687-058, 218,000 jobs nationally).  (R. 28.)

Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 29.)

Plaintiff requested review of the decision, and the Appeals Council denied further review, which made the ALJ's decision the final decision of the Commissioner.  (R. 1-6.) Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.

## II.    RELEVANT RECORD

On May 19, 2014, Plaintiff, who was eleven years old at that time, was seen for a diagnostic assessment by Carol Follingstad, PsyD, LP, who found based on Wechsler Intelligence Scale for Children that Plaintiff had a full-scale IQ of 53, which placed in him at the lowest .1%, characterized as extremely low.  (R. 669.)

Plaintiff turned 18 in February 2021.  (R. 19.)

On February 10, 2021, Plaintiff was seen by Angela Folstad, MD, for a follow-up for his depression and anxiety.  (R. 727.)  It was noted that Plaintiff was in a "in a nice foster care situation," was about to turn 18, and that he would be out of the county system and had planned to move back with his mother.  (R. 727.)  Plaintiff was working on his GED.  (R. 727.)  Plaintiff had been taking sertraline,[4] which was helpful, but he represented that he was still quite sad and unmotivated, with a GAD[5] score of 17 and a

---

[4]    Sertraline is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder.  *See* https://medlineplus.gov/druginfo/meds/a697048.html (last visited June 10, 2025).

[5]    The Court understands this assessment to be the Generalized Anxiety Disorder 7-item, or GAD-7.  The GAD-7 is a screening test to determine if a patient has generalized anxiety disorder.  The scoring is as follows: 0-4, minimal anxiety; 5-9, mild anxiety; 10-14, moderate anxiety; 15 or greater, severe anxiety.  *See* Generalized Anxiety Disorder 7-item (GAD-7), Nat'l HIV Curriculum, https://www.hiv.uw.edu/page/mental-health-screening/gad-7 (last visited June 10, 2025).

PHQ[6] score of 16. (R. 727.) All other systems were negative. (R. 727.) Dr. Folstad opined that Plaintiff was "responding to the medication, but still quite a bit of room for some therapeutic benefit. I will increase his dose from 100 mg to 150 mg daily, we discussed options, including the military." (R. 728.)

On April 6, 2021, Plaintiff was again seen by Dr. Folstad for a follow-up related to his anxiety and depression. (R. 725.) Plaintiff lived with his father and Plaintiff "state[d] that things are going well. Working on his GED, planning on getting a car tomorrow and then he will start looking for a job." (R. 725.) Plaintiff continued to take sertraline 150 mg daily and he believed that this dosage was appropriate. (R. 725.) Plaintiff further represented that he stayed in contact with his prior foster family. (R. 725.) His GAD and PHQ were both a bit elevated, but were not concerning to Dr. Folstad. (R. 726.) Dr. Folstad characterized Plaintiff as "bright and interactive, even smiles in the office today." (R. 726.) Plaintiff noted that he was unsure as to what he wanted to do with his life, describing "himself as being very lazy." (R. 726.) Dr. Folstad suggested Plaintiff consider work as a police officer. (R. 726.) Dr. Folstad instructed Plaintiff to continue taking sertraline 150 mg daily. (R. 726.)

On April 25, 2021, Plaintiff's father filled out a function report for Plaintiff. (R. 563.) Plaintiff noted no problems dealing with his personal care, although he needed reminders. (R. 564.) Plaintiff also represented that he was able to shop accompanied by

---

[6]    The PHQ-9 is a screening test to measure the severity of depression. It is scored as follows: 0-4, none-minimal; 5-9, mild; 10-14; moderate; 15-19, moderately severe; 20-27, severe. *See* Patient Health Questionnaire-9 (PHQ-9), Nat'l HIV Curriculum, https://www.hiv.uw.edu/page/mental-health-screening/phq-9 (last visited June 10, 2025).

family; had difficulty dealing with financial matters; his interests pertained to television, fishing, and family activities; he had no difficulty getting along with others; he lacked focus on some tasks; he was able to follow written instructions most of the time; he had a fair ability to follow spoken instructions; was uncomfortable around strangers and did not interact with the same; and could deal with changes in routine fairly well if eased into it. (R. 563-570.)  On April 27, 2021, Plaintiff's father also noted that Plaintiff did not like hanging out with strangers due to the racial climate in the area.  (R. 576, 578.)

On June 7, 2021, Plaintiff was again seen by Dr. Folstad.  (R. 723.)  His GAD and PHQ scores were about the same as the previous appointment.  (R. 723.)  Plaintiff did not have any summertime plans, he was working around his father's rural house doing chores or yard work, and he had to complete his GED.  (R. 723.)  According to Dr. Folstad, Plaintiff continued to think about suicide but had no plan.  (R. 723.)  All of Plaintiff's other systems were negative.  (R. 723.)  Plaintiff's active problems were anxiety and depression.  (R. 723.)  His mood and affect were frustrated and quiet, which could have stemmed from his father speaking over Plaintiff during the appointment.  (R. 724.)

On June 14, 2021, Plaintiff underwent a consultative examination with Mark Lysne, PhD, LP.  (R. 710.)  Plaintiff's father was present.  (R. 710.)  Plaintiff was cleanly groomed and appropriately dressed.  (R. 710.)  He was able to remember his birthdate, but did not know his address.  (R. 710.)  Plaintiff knew that he took medications, but did not know the names of the medications.  (R. 710.)  Plaintiff's father reported that Plaintiff was taking Adderall and sertraline.  (R. 710.)  Plaintiff was taking a GED program, but he was unsure of his current status, except that he had taken practice tests.  (R. 710.)

Plaintiff stated that he quit high school in ninth grade because he lost interest, but that he was not on an individualized education plan ("IEP") at that time (although he had been during grade school). (R. 711.) Plaintiff could read and "barely passed" Algebra I. (R. 711.) Plaintiff claimed he related well with his teachers with no behavioral problems. (R. 711.) Plaintiff stated that he still believed he struggled with ADHD and became irritable when distracted or interrupted while concentrating. (R. 711.) While he occasionally lost things, Plaintiff represented that he otherwise he stayed "pretty well organized." (R. 711.) Plaintiff's father claimed Plaintiff mostly became withdrawn around strangers. (R. 711.) Plaintiff asserted that his mood was "happy", but that at times he would become mad or irritable. (R. 712.) Plaintiff denied any excessive energy, impulsivity, racing thoughts, or perseverating behaviors. (R. 712.) When asked about anxiety, Plaintiff denied most symptoms. (R. 712.) He denied any suicidal ideation. (R. 712.) Plaintiff denied any anhedonia or self-esteem problems. (R. 712.)

Plaintiff reported that he lived with his father, his older brother, and six siblings, ranging in age from 5 to 17 years. (R. 712.) Plaintiff's daily activities included getting up, going outside, mowing the lawn or being outside, going back in to eat, and fishing. (R. 712.) Plaintiff was able to do chores, but did not cook. (R. 712.) His indoor activities included watching television and YouTube videos, as well as playing video games. (R. 712.) He was able to keep his room clean and did his own laundry. (R. 712.) Plaintiff used an alarm to remember to take his medications. (R. 712.)

Socially, Plaintiff did not have any close friends. (R. 712.) He denied any persistent difficulties relating to his parents or siblings. (R. 712.) When asked what he

found difficult in terms of relating to others, Plaintiff could not articulate anything.  (R. 712.)  Plaintiff reported no legal system involvement.  (R. 712.)

According to Dr. Lysne, Plaintiff presented as withdrawn and avoidant, with poor eye contact.  (R. 713.)  Plaintiff was passively resistant to direct questioning and preferred to defer to his father; his ability to maintain conversation was below average, almost exclusively giving one word responses to most questions or not responding, making it appear that both his receptive and expressive language skills were below average; his recall and description of his psychological history and functioning was poor and lacked insight, relying on his father for this history; he was oriented to place and person; he knew the date but did not know the month or what day of the week it was; he was only able to identify the current president; he only recalled one accurate detail about the waiting room when asked for three; his mood appeared dysthymic; his affect was constricted with underlying irritability; he denied suicidal ideations; his thought processes was slow and impoverished; there was no thought blocking or noticeable word retrieval difficulties; he appeared internally preoccupied and bored; and his reality contact was intact.  (R. 713.)  In screening for working memory, Dr. Lysne noted that Plaintiff was unable to recall any of three words after 5 minutes and none again after 30 minutes.  (R. 713.)  An estimate of his concentration and short-term memory was partly based on the Digit Span subtest from the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), which showed that on digits forward he was able to recall 3 digits in length, which is below average; and on digits backwards his longest was 2 digits in length, which was also below average.  (R. 713.)  When asked to count by 3s to 40, Plaintiff stated he would be

unable to do so, despite prompts and cues.  (R. 713.)  He had a similar response to serial

7s, was unable to compute basic arithmetic, unable to spell the words "world" and "earth"

correctly, and gave up on trying to name the months of year.  (R. 714.)  According to Dr.

Lysne, his "performance suggests deficits that would not be expected.  His motivation

was poor and current screening results should not be considered a fully valid estimate of

his working memory, concentration, or processing speed."  (R. 714.)  In addition, Dr.

Lysne noted that Plaintiff's general fund of knowledge was well below average,

answering only one of the first 14 question of the WAIS-IV correctly, far below

expectations.  (R. 714.)  His abstract thinking ability as indicated by proverb

interpretation was also well below average range, with no accurate responses.  (R. 714.)

In sum, Dr. Lysne found that "Plaintiff's IQ could be estimated to be in the borderline to

low average range.  However, again this estimate is based on rather [Plaintiff's] low

motivation and engagement and should not be considered highly valid."  (R. 714.)  The

diagnostic impression for Plaintiff was unspecified bipolar disorder, a history of ADHD,

probable learning disorders, and schizoid and avoidant personality traits.  (R. 714-15.)

Dr. Lysne then offered the following opinion with respect to Plaintiff's limitations:

> [V]erbal reasoning, working memory, processing speed, and concentration
> seem below average based on current examination status. However, he has
> the ability to understand simple, entry level instructions. I would estimate
> that he would likely have at least moderate difficulty remembering and
> following through with more complex instructions. He would likely require
> initial and occasional ongoing supervision when learning more complex
> tasks. He exhibited adequate energy but there are significant motivation
> issues, likely resulting in slight to moderate difficulty completing routine
> tasks with adequate persistence and pace. [Plaintiff's] social skills suggest
> that he would have at least occasional difficulty interacting effectively with

others. For entry level work requirements, it seems likely that his tolerance
for stress would be slightly low to adequate.

(R. 715.)

On February 6, 2022, Plaintiff went to the emergency room with complaints of

foot pain. (R. 846.) The examination of Plaintiff showed that he was alert and oriented

to person, place, time, and situation; he was cooperative; his memory function was

normal for his age; he demonstrated normal judgment and insight; and he exhibited

normal behavior. (R. 848.)

Plaintiff was seen for another psychological consultant evaluation on May 26,

2022, by Dion Darveaux, PhD, LP. (R. 819.) Plaintiff told Dr. Darveaux that he did not

have many friends. (R. 820.) With respect to activities, Plaintiff claimed he enjoyed

neighborhood basketball and football. (R. 820.) He also enjoyed fishing, video games,

and watching videos. (R. 820.)

Plaintiff attended the appointment with his father. (R. 820.) When his father was

present, Plaintiff acted inhibited and allowed his father to answer the questions. (R. 820.)

During the time when his father was present, Plaintiff would participate if a specific

question was posed to him directly. (R. 820.) When his father was absent, Plaintiff tried

his best to participate and appeared to put forth a good effort when answering questions

and during testing. (R. 820.) His activity level was average to slightly below average.

(R. 820.) Plaintiff displayed behaviors suggesting that he was paying close attention to

questions, while his ability to repeat back information was poor. (R. 820.) He displayed

largely normal speech with some need to have words defined for him. (R. 820-21.)

Plaintiff described his typical daily routine as getting up at 7 a.m., watching television, and cleaning his room a little bit. (R. 821.) Plaintiff typically did not have breakfast, with the largest meal of the day occurring in the afternoon, when he ate with his family and sometimes helped with food preparation. (R. 821.) Plaintiff also represented that he could cook eggs and ramen for himself. (R. 821.) He also helped with household chores, such as vacuuming, taking out the trash, and washing the dishes. (R. 821.)

The Bender Gestalt II test, a reliable way to assess visual-motor development, placed Plaintiff at the age at 7 yrs, 6 months. (R. 821.) Plaintiff's performance on the Bender Test was characterized as highly unusual for an individual his age. (R. 823.) His Penbody Picture Vocabulary Test score placed him at the lowest 0.1 percentile, at a pre-kindergarten level and the equivalent of a 3-year and 4-month-old child. (R. 822.)

The WAIS-IV testing results included a Full Scale IQ of 51. (R. 822.) Plaintiffs' performance on the WAIS-IV indicated that he was functioning overall within the range of a moderate intellectual disability and at approximately the lowest 0.1 percentile rank when compared to his age mate peers. (R. 822.)

Also, due to the "profound nature" of Cody's inability to grasp visual concepts, malingering (at least to some degree) was suspected, but Dr. Darveaux did "<u>NOT</u> believe [Plaintiff] was malingering." (R. 822.)

Dr. Darveaux's diagnostic impressions for Plaintiff was ADHD, combined type, by history and at least partially substantiated via the evaluation; bipolar disorder,

undifferentiated type, by history; social anxiety disorder; and intellectual disability, mild

- moderate severity.  (R. 824.)  Dr. Darveaux further opined:

> [He] clearly has learning and attention difficulties, as well as what appears
> to be relatively mild social anxiety and depression. Cody's ability to relate
> and interact with others is severely diminished probably due to intellectual
> disabilities and lack of socialization experiences outside of family members.
> As such, his ability to gain and maintain employment without significantly
> direct supervision appears extremely impaired.

(R. 824.)

Plaintiff testified at the hearing before the ALJ that he went to school through

eleventh grade and claimed that he was in special education during this time.  (R. 45, 51.)

Plaintiff was in the process of obtaining his GED.  (R. 48.)  Plaintiff further testified that

he spent his time playing video games over the internet with others, approximately 4-5

hours per day.  (R. 46.)  Plaintiff lived with his father and brother, and represented that he

did chores around the house, including sweeping, doing the dishes and taking the garbage

out.  (R. 47.)  Plaintiff noted that he did not have any friends.  (R. 48, 51.)  Plaintiff

represented that he did not handle money.  (R. 53.)  Plaintiff also claimed that he did not

like going shopping because of his anxiety about being around other people.  (R. 53.)

### III.    LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether

substantial evidence in the record as a whole supports the decision, 42 U.S.C. § 405(g);

*Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's

decision results from an error of law, *Nash v. Comm'r, Soc. Sec. Admin.* 907 F.3d 1086,

1089 (8th Cir. 2018).  As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations. And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is more than a mere scintilla. It means— and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (cleaned up).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (marks and citation omitted). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).

## IV.    DISCUSSION

Plaintiff argues that the ALJ failed to provide the correct weight to the opinions of Dr. Lysne and Dr. Darveaux, including by giving the "greatest weight" to Dr. Lysne's opinion and failing to adequately credit the supportability and consistency of Dr. Darveaux's opinion. (Dkt. 10 at 13-17.) On this basis, Plaintiff argues that the RFC cannot be relied upon to deny benefits. (*Id.* at 17, 19.) Plaintiff further argues that the RFC does not take into account all of his limitations given his education level; the lack of

his ability to engage in daily activities without his family as a part of "structed living environment"; and testing that placed him well below the first percentile in areas related to working memory and perceptual reasoning, including in some cases to the level of a child of 3 or 7 years old.  (*Id.* at 19-21.)

In addition, Plaintiff asserts that the ALJ committed reversible error, even accepting an RFC for no more than "occasional" contact with others in a work setting was appropriate, as the ALJ fails to explain how such an individual would succeed in a training period when more than "occasional" contact with others is required.  (*Id.* at 21-22.)

## A.    Plaintiff's RFC

"A disability claimant has the burden to establish [his] RFC."  *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* at 591. (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  "[T]here is no requirement that an RFC finding be supported by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of

[her] limitations." *Id.* (quoting *Myers*, 721 F.3d at 527).  Indeed, "'[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'"  *Perks*, 687 F.3d at 1092 (quoting *Cox*, 495 F.3d at 619-20) (citations omitted).  That said, an ALJ may not simply draw her own inferences about a claimant's functional ability from medical reports.  *See Koch v. Kijakazi,* 4 F.4th 656, 667 (8th Cir. 2021) (citation omitted).

As stated previously, the ALJ set forth the following RFC for Plaintiff:

I find that since September 1, 2021, the claimant has had the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant can understand, remember, and carry out simple instructions. He can make simple work-related decisions. He can tolerate occasional changes in a routine work setting, and occasional interaction with supervisors, co-workers, and the public.

(R. 23.)

### 1.    Weight Given to Medical Opinions

As stated previously, Plaintiff argues that the ALJ failed to provide the correct weight to the opinions of Dr. Lysne and Dr. Darveaux, including because the ALJ gave the "greatest weight" to Dr. Lysne's opinion and failed to adequately credit the supportability and consistency of Dr. Darveaux's opinion.  (Dkt. 10 at 15-17.)  With regard to the weight assessed to medical opinions and administrative findings, pursuant to section 416.920c of the SSA's regulations: "[An ALJ] will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a).  When a medical source provides one or more medical opinions

or prior administrative medical findings, the ALJ will consider those medical opinions or prior administrative medical findings from that medical source together using the following factors: (1) supportability, (2) consistency, (3) relationship with the claimant (including length and purpose of treatment and frequency of examinations, among other factors), (4) specialization, and (5) other factors (for example, when a medical source has familiarity with the other evidence in the claim).  20 C.F.R. § 416.920c(a), (c)(1)-(5). The most important factors an ALJ considers when the ALJ evaluates the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency.  20 C.F.R. § 416.920c(a).

The SSA further states:

> The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

20 C.F.R. § 416.920c(b)(2); *see also Michael B. v. Kijakazi*, No. 21-CV-1043 (NEB/LIB), 2022 WL 4463901, at *1 (D. Minn. Sept. 26, 2022) ("The 'most important factors' are supportability and consistency.") (citation omitted).

The SSA has described supportability and consistency as follows:

> (1) Supportability. The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more

persuasive the medical opinions or prior administrative medical finding(s) will be.

(2) Consistency. The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.

20 C.F.R. § 416.920c(c)(1)-(2). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. 5844-01, 5853, 2017 WL 168819 (Jan. 18, 2017); *see also* 20 C.F.R. § 416.920c(c)(1). "The ALJ's discussion of [a medical source's] treatment and examination notes reflects the ALJ's consideration of the supportability factor with respect to their opinions." *Stephanie B. v. Kijakazi*, No. CV 22-837 (JWB/DTS), 2023 WL 3394594, at *1 (D. Minn. May 11, 2023) (citation omitted); *Troy L. M. v. Kijakazi*, No. 21-CV-199 (TNL), 2022 WL 4540107, at *11 (D. Minn. Sept. 28, 2022) (addressing the consistency of the medical source's treatment records with the opinion provided as to functioning in conjunction to supportability). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. § 416.920c(c)(2).

The ALJ was required to explain how she considered the supportability and consistency factors when evaluating the persuasiveness of the medical opinions. *See Shannan G. v. Kijakazi*, No. 22-CV-1895 (NEB/ECW), 2023 WL 4707843, at *14 (D. Minn. June 27, 2023) ("[A]n ALJ must explain how [supportability and consistency]

were considered in determining the persuasiveness of a medical opinion.") (cleaned up), *R. & R. adopted*, 2023 WL 4704588 (D. Minn. July 24, 2023).

Defendant responds that the ALJ properly evaluated the May 2022 opinion of Dr. Darveaux and found it unpersuasive. (Dkt. 15 at 8.) Dr. Darveaux opined that Plaintiff's ability to relate and interact with others was severely diminished, and his ability to gain and maintain employment without significant direct supervision was extremely impaired. (R. 823.) Defendant argues that the ALJ properly found this opinion unpersuasive as it was unsupported by Plaintiff's reports to Dr. Darveaux regarding his activities in the community and the available medical records. (Dkt. 15 at 8.) Defendant further argues that Plaintiff's IQ score and resulting limitations were inconsistent with his daily activities and his first consultative examination with Dr. Lysne. (Dkt. 15 at 8-10.)

With respect to opinions of Dr. Darveaux, the ALJ found as follows:

In May 2022, the claimant attended another psychiatric consultative examination, which was conducted by Dion Darveaux, Ph.D. The claimant reported that he enjoyed playing neighborhood football and basketball, fishing, playing video games, and watching videos (B9F/5). Dr. Darveaux found that the claimant's cleanliness and grooming were above average (B9F/5). His activity level was average to slightly below average, and though he reported having attentional difficulties, Dr. Darveaux indicated that the claimant displayed nonverbal behaviors that suggested he was paying close attention, but that his ability to repeat information back to Dr. Darveaux indicated that his attention was extremely poor (B9F/5). He enunciated his words well, and though his command of language was adequate for basic conversational speech, the claimant needed to ask for clarification more often than most individuals his age (B9F/5). The claimant reported that he became anxious in church, that he was irritable, and that he had racing thoughts (B9F/6). His eye contact was glancing and brief, his self-insight was very poor and basic, and he said that he sometimes heard voices calling his name (B9F/6). He said that he cleaned his room every day, that he sometimes helped prepare meals, and that he assisted with household chores, including vacuuming, taking out the trash, and helping with dishes (B9F/6). Dr.

Darveaux found that the claimant had a full-scale IQ of 51, and he was noted as having social anxiety disorder and mild to moderate intellectual disability (B9F/7-8). As discussed more below, Dr. Darveaux gave a very limiting opinion, indicating that the claimant's was "extremely impaired" in his ability to work without significantly direct supervision (B9F/8).

\* \* \*

The only real outlier to the otherwise moderate limitations, is Dr. Darveaux's finding of a full-scale IQ of 51, but the extreme limitations in Dr. Darveaux's opinion are not consistent with the activities of daily living that the claimant reported at that exam (*i.e.,* that he enjoyed playing neighborhood football and basketball, fishing, playing video games, and watching videos, and that he cleaned his room, helped prepare meals, and assisted with chores, like vacuuming, taking out the trash, and doing dishes), nor are they consistent with the findings from the first consultative examination, as outlined above. Moreover, other medical records show that the claimant was not so limited. For instance, in December 2021, he was alert and pleasant, he followed commands, and he answered questions appropriately (B8F/7). In February 2022, he was alert and oriented to person, place, time, and situation, he was cooperative, his memory functioning was normal, he had normal judgment and insight, and he exhibited normal behavior (B12F/3). Accordingly, I find that the claimant's limitations are no greater than what the residual functional capacity statement accounts for.

\* \* \*

I considered the opinion of the second consultative examiner, Dion Darveaux, Ph.D., which indicates that the claimant's ability to relate and interact with others is severely diminished, and that his ability to gain and maintain employment without significantly [sic] direct supervision is extremely impaired (B9F). This is not persuasive. It is not supported by Dr. Darveaux's examination, in which the claimant reported that he enjoyed playing neighborhood football and basketball, fishing, playing video games, and watching videos, and he said that he daily cleaned his room, sometimes helped prepare meals, and assisted with household chores, including vacuuming, taking out the trash, and helping with dishes (B9F/5-6). Likewise, this opinion is not consistent with the record, which supports the finding that the claimant is able to perform unskilled work with occasional interaction with others (see, e.g., B4F/1-5; B8F/7; B12F/3).

(R. 25-27.)

The Court finds that the ALJ properly considered the consistency and supportability of Dr. Darveaux's opinions, regardless of the supporting IQ test results. "An ALJ may reject IQ scores that are inconsistent with a claimant's daily activities and behavior, especially when the scores are based on a one-time examination by a nontreating psychologist." *Chunn v. Barnhart,* 397 F.3d 667, 672 (8th Cir. 2005) (citing *Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir.1998)). An ALJ may also discredit a consultant's opinions based on the reports provided by a claimant of their daily activities to the consultant. *See Williams v. Colvin,* No. CIV. 14-616 PAM/JJK, 2015 WL 520692, at *15 (D. Minn. Feb. 9, 2015) ("[The] ALJ assigned little weight to the opinions of Mr. Rassa, Ms. Lunde, and Mr. Swaverland, explaining how their opinions conflicted with the record as a whole. In particular, the ALJ noted that Ms. Lunde's and Mr. Rassa's opinions regarding Plaintiff's inability to continue working contradicted their own observations that Plaintiff's symptoms and reported activities of daily living improved with treatment."). Here, the ALJ the addressed the low IQ score and discounted Dr. Darveaux's reliance on the score and his other limitations given Plaintiff's own reports of activities during the consultative examination. This included Plaintiff's reports to Dr. Darveaux that he enjoyed neighborhood basketball and football; enjoyed fishing, video games, and watching videos; that he assisted with chores and meal preparation; and could cook for himself. (R. 819.)

The ALJ also addressed the consistency of Dr. Darveaux's opinion by relying on other medical records and Dr. Lysne's opinion. Indeed, medical records and other records support the weight provided to Dr. Darveaux's opinions, including: reports that

Plaintiff was working on his GED, planning on getting a car, and then planned on looking for a job (despite Plaintiff's self-report that he was "very lazy"); his report that he was staying in contact with his foster family and that his examination showed he was "bright and interactive"; that he was able to work on a car; that he helped a non-family member with jackhammering; that he performed chores or yard work at home; that he went fishing; his representations to Dr. Lynse that he was well organized, his representations that he could read and that he passed Algebra I (albeit, "barely"); that he lived with seven siblings and he denied any persistent difficulties with them and could not articulate what problems he had with others; an examination of Plaintiff (a few months before Dr. Darveaux's consultation) showing that his memory function was normal for his age, he demonstrated normal judgment, he demonstrated normal insight, and he exhibited normal behavior; and his own representations in a function report that he had no difficulty getting along with others, that he was able to follow written instructions most of the time, he had a fair ability to follow spoken instructions, and could deal with changes in routine fairly well if eased into it. (*See. e.g.*, R. 568-70, 710, 711, 712, 723, 725, 726, 758, 767, 848.) This Court finds that this evidence coupled with Dr. Lysne's opinions, *infra*, which included questions about Plaintiff's efforts with respect to testing, constitutes substantial evidence supporting the ALJ's finding with respect to the consistency of Dr. Darveaux's opinions with the medical record, including the testing scores relied upon by Dr. Darveaux.

Plaintiff also takes issue with the ALJ giving the greatest weight to the opinion of Dr. Lysne, which he asserts was primarily supported by the self-reports of Plaintiff, even

though Dr. Lysne found him difficult to assess.  (Dkt. 10 at 16.)  Plaintiff contrasts this with Dr. Darveaux's opinion, which Plaintiff argues included self-reports and test results showing profound deficits in attention, retention of information, and perceptual reasoning, and also because Dr. Lysne was not provided with clinical data such as the IQ testing from Dr. Follingstad.  (*Id.* at 16-17, 19.)

Defendant counters that the ALJ and Dr. Lynse were not required to consider Dr. Follingstad's evaluation from when Plaintiff was only eleven years old, as it is not relevant to this determination.  (Dkt. 15 at 5-6, 7.)  As noted above, when the SSA redetermines child disability after a claimant turns 18, the agency applies the standards for adult applicants, without deference to the prior disability finding and award of child's SSI.  *See* 20 C.F.R. § 416.987.

Here, Dr. Follingstad's opinions and assessment of Plaintiff's IQ were taken into account when SSA awarded Plaintiff SSI benefits in its January 30, 2015 determination.  (R. 87, 94.)  Medical improvement is not a factor for consideration as to Plaintiff's eligibility for benefits as an adult, since the concept of redetermination is to treat the transition to adult SSI as a new application.  *See* 20 C.F.R. § 416.987(b) ("[W]e will not use the rules in § 416.994 for determining whether disability continues.").  Even assuming that evidence from before a claimant turned 18 is relevant to the determination here, Plaintiff cites no legal basis, nor can the Court find any, for the proposition that an ALJ cannot give weight to a consultative examination because the examiner did not consider testing that occurred seven years earlier, when the Plaintiff was eleven years old. Nor does Plaintiff provide any authority that ALJ was required to consider Dr.

Follingstad's IQ test results from 2014, years before the ALJ's determination, when determining whether Plaintiff was disabled under the adult standards as of September 1, 2021. Indeed, the Court notes that Dr. Darveaux also did not consider Dr. Follingstad's 2014 testing, yet Plaintiff apparently has no qualms about her failure to do so when arguing that the ALJ should have given Dr. Darveaux's opinion more weight. (*See* R. 819-23.)

Defendant also challenges Plaintiff's argument that the ALJ improperly gave Dr. Lysne's opinion the greatest weight, responding that the ALJ properly considered both the supportability and consistency factors in evaluating Dr. Lysne's opinion. (Dkt. 15 at 6-8.) The ALJ addressed Dr. Lysne's opinion as follows:

> Since reaching adulthood, the claimant has attended two psychiatric consultative examinations. The first of these was performed by Mark Lysne, Ph.D. in June 2021. The results of that examination are questionable, since Dr. Lysne indicated that the claimant had poor/low motivation and engagement, which did not allow for fully valid findings (*see,* B4F/5). At that time, the claimant reported that his working memory was not very good, that his concentration was poor, that he became irritable when distracted or interrupted when concentrating, and that his mood varied and he sometimes became mad (B4F/2-3). He endorsed feeling distrustful of others but denied impulsivity, racing thoughts, perseverating behaviors, and self-esteem problems (B4F/3). He reported that he dressed without difficulty, mowed the lawn, went fishing, played video games, and watched YouTube (B4F/3). He also said that he did the dishes, cleaned his laundry, kept his room tidy and organized, watched television, and took showers, and he denied having problems maintaining his personal hygiene (B4F/3).
>
> Dr. Lysne found that the claimant was cleanly groomed and appropriately dressed but indicated that the claimant was not able to identify his address, his father's phone number, or his Social Security number, and the claimant said that he did not know the reason for his appointment (B4F/1). The claimant's speech was brief and soft, and he was often difficult to hear, requiring frequent requests that he repeat himself (B4F/1). Dr. Lysne found that the claimant was withdrawn and avoidant, his eye contact was poor, and

he was passively resistant to direct questioning and preferred to defer to his father, who was also present (B4F/4). His ability to maintain conversation was below average, and at times he would simply not respond, and so "it seemed" that both his receptive and expressive language were below average (B4F/4). The claimant's recall and description of his psychiatric history and functioning was poor and he lacked insight (B4F/4). Though he was oriented to place and person, he did not know the month or day of the week; he was able to name the current president, but none of the previous 3 presidents; and he was unable to identify any recent news stories (B4F/4). He recalled one accurate detail about the waiting room when asked for three, his mood appeared dysthymic, his affect was constricted, and he was a poor, inconsistent, and vague historian (B4F/4).

Dr. Lysne also found that the claimant's thought process was slow and impoverished, and he seemed internally preoccupied and bored (B4F/4). He was unable to recall any of three words after 5 or 30 minutes, his digit span was below average, and when asked to perform serial 3s and serial 7s, the claimant said that he was unable and would not attempt this, despite prompts and cues (B4F/4). He was unable to compute math problems, spell the words "world" and "earth" forward or backwards, and when asked to name the months backwards, the claimant made several errors and quit, stating that he did not know the months very well. Overall, Dr. Lysne found that the claimant's performance suggested deficits that would not be expected (B4F/5). As noted above, the claimant had poor motivation, and so Dr. Lysne concluded that the testing should not be considered a full valid estimate of the claimant's working memory, concentration, or processing speed (B4F/5). The claimant's general fund of knowledge was well below average, and he only answered 1 of 14 test questions correctly on the WAIS-IV subtest (B4F/5). His abstract thinking was also well below average, with no accurate response to any proverbs, his comprehension of social demands was below average, and he had poor insight (B4F/5). Dr. Lysne indicated that the claimant's IQ was estimated in the borderline to low average range, but that these results should not be considered highly valid due to the claimant's low motivation and engagement (B4F/5). Dr. Lysne included diagnoses of unspecified bipolar disorder and a history of attention deficit hyperactivity disorder (B4F/5).

* * *

I considered the opinion of the first consultative examiner, Mark Lysne, Ph.D., which indicates that the claimant can understand simple, entry level instructions, he would have moderate difficulty remembering and following through with more complex instructions, he would require initial and occasional ongoing supervision when learning more complex tasks, he would

have slight to moderate difficulty completing routine tasks with adequate persistence and pace, and he would have occasional difficulty interacting effectively with others (B4F). This is generally persuasive. It is generally supported by Dr. Lysne's examination, which shows that the claimant was withdrawn, he had poor eye contact, and he was a poor, inconsistent, and vague historian (B4F/4). Moreover, it is generally consistent with the record, which shows that the claimant is able to perform unskilled work and that he has social interaction limitations (*see, e.g.,* B8F/7; B9F/5-8; B12F/3).

(R. 24-27.)

As a starting point the Court rejects Plaintiff's argument that by finding Dr. Lysne's opinions "generally consistent" equate to giving his opinion the "greatest weight." The ALJ simply said that Dr. Lysne's opinions were "generally persuasive." (R. 27.) "In this case, there is no indication that the ALJ afforded the state psychological consultants 'significant weight'—the ALJ simply provided that their opinions were 'generally persuasive.' Plaintiff does not cite to any authority that the phrase 'generally persuasive' has [] equivalent heightened evidentiary weight." *Danny V. v. Kijakazi*, No. 20-CV-2014 (LIB), 2022 WL 1715190, at *13 (D. Minn. Mar. 31, 2022). While it is not entirely clear, it appears that Plaintiff may also be arguing that because the ALJ found Dr. Lysne's opinions persuasive, all of the limitations contained in his opinion must be included in the RFC. (Dkt. 10 at 18-19.) However, "because there is no indication that the consultants were afforded controlling weight, the ALJ was not required to include in the RFC every limitation they described." *Id.* at *12 (underlining and citation omitted); *see also M.Y. v. Dudek*, No. 24-CV-00563 (ECW), 2025 WL 676479, at *11 (D. Minn. Mar. 3, 2025) (citation omitted).

Moreover, for the reasons set forth with respect to Dr. Darveaux's opinion, the Court finds no error in the ALJ failing to discount Dr. Lysne's opinions based on the IQ tests performed by Dr. Darveaux and Dr. Follingstad. It is important to emphasize that such an argument is undermined by the fact that Dr. Lysne conducted his own IQ testing of Plaintiff and concluded that: "[Plaintiff's] IQ could be estimated to be in the borderline to low average range. However, again this estimate is based on rather [sic] [Plaintiff's] **low motivation and engagement** and should not be considered highly valid." (R. 714 (emphasis added).)

Further, although Plaintiff complains that Dr. Lysne's opinion is based on his self-reports, with respect to supportability, "clinical interviews and evaluations are objective measures that can properly inform a doctor's mental health assessment, even if they rely on a patient's self-reporting." *Jeanett M. v. Kijakazi*, No. 21-CV-00587-JSC, 2022 WL 1239344, at *3 (N.D. Cal. Apr. 27, 2022) (citing *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017) ("Psychiatric . . . [d]iagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient. But such is the nature of psychiatry.")); *see also Craig A. P. v. Comm'r of Soc. Sec.*, No. 5:22-CV-0322 (FJS/DEP), 2023 WL 5016320, at *7 (N.D.N.Y. May 31, 2023) ("Although the supportability factor involves primarily an assessment of the objective medical evidence and supporting explanations, the ALJ's analysis of plaintiff's functioning cannot wholly exclude the subjective reports of the claimant made to that provider and documented in treatment records, as such reports inform the provider's treatment of the claimant, particularly in cases involving mental health and other such less obvious impairments that

are less conducive to confirmation through objective means."), *R. & R. adopted*, 2023

WL 4677060 (N.D.N.Y. July 21, 2023). Regardless, this argument ignores Dr. Lysne's

mental status examination of Plaintiff. (R. 713-14.) In sum, the ALJ's reliance on Dr.

Lysne's opinion and the RFC assessed by the ALJ (generally speaking, that Plaintiff is

able to perform unskilled work subject to social interaction limitations) is supported by

the record as whole for the same reasons that the ALJ's evaluation of the consistency of

Dr. Darveaux's opinion with the record—including Plaintiff's own reports that he had no

difficulty getting along with others, that he was able to follow written instructions most

of the time, he had a fair ability to follow spoken instructions, and could deal with

changes in routine fairly well if eased into it. (*See supra*, at 21-22.)

### 2.    Structured Living Environment

As set forth above, Plaintiff also argues that the assessed RFC does not adequately

reflect his current status as an individual who lives in the equivalent of a "structured

living environment" in order to have his basic needs met. (Dkt. 10 at 20-21.) In support

of this argument, Plaintiff relies on *Nowling v. Colvin*, 813 F.3d 1110 (8th Cir. 2016);

*Blake R. v. Berryhill*, No. 0:17-CV-4273-KMM, 2019 WL 1229828 (D. Minn. Mar. 15,

2019); and *Lillard v. Berryhill*, 376 F. Supp. 3d 966, 983 (E.D. Mo. 2019). (*Id.* at 20-21.)

Social Security Ruling ("SSR") 96-8p provides that "[t]he RFC assessment must

be based on all of the relevant evidence in the case record, such as: . . . [the] need for a

structured living environment. . . ."  1996 WL 374184, at *5 (S.S.A. July 2, 1996). While

the Eighth Circuit has not addressed SSR 96-8p with respect to an RFC assessment, it has

addressed how an ALJ should analyze the effects of a structured setting when applying the Listing, stating:

> [T]he nature of the medical condition and the nature of the life activities, including such considerations as independence, should be considered against the backdrop of whether such activities actually speak to claimant's ability to hold a job. Participation in activities with family or activities at home and at "your own pace" may not reflect an ability to perform at work. And, "a claimant need not be bedridden to qualify for disability benefits."

*Nowling*, 813 F.3d at 1121-22. In *Nowling*, the plaintiff's family member testified that she helped the plaintiff on a daily basis and that the plaintiff "refused to drive herself or appear in public, but managed self-care, housekeeping, and yard care on her own pace and participated in family events and other events when accompanied." *Id.* at 1117-18. In addition, the family member described the assistance that she and other family members would provide when the plaintiff suffered a seizure-like episode, which had become fairly routine. *Id.* at 1118. The Eighth Circuit ultimately concluded that the ALJ improperly focused on a treating provider's notes showing improvement in the claimant's condition "without acknowledging the unpredictable and sporadic nature of [her] symptoms, and without assessing the effect of her structured living environment." *Id.* at 1123.

In *Blake R. v. Berryhill*, the plaintiff's record showed that while in school and participating in small special-education courses, the plaintiff nonetheless required the one-on-one assistance of a paraeducator for 360 minutes every day to ensure that he engaged in school work and was not disruptive to others; his need for support continued after his schooling was completed, as evidenced by the appointment of his mother as his

legal guardian under a Minnesota law which, among other things, gave her the power to make significant decisions about the plaintiff's living conditions and care and imposed the duty upon her to provide for his care, comfort, and maintenance needs, including food, clothing, shelter, health care, social and recreational requirements, and, whenever appropriate, training, education, and habilitation or rehabilitation; and the fact that the plaintiff had continuing issues with basic hygiene, including not showering and not going to the bathroom to freshen up or change clothing each time he had an "accident," needing help with a stooling schedule, and suffering from bad odors.  2019 WL 1229828, at *5-6. Based on this, the court in *Blake R.* found that the "ALJ's RFC finding does not fully account for the fact that Blake's limited functioning, including his acute self-care and personal hygiene concerns, occurred in the context of significant support from his school and his mother."  *Id.* at *5 (citation omitted).  The court reached this conclusion despite the fact the claimant cleaned around the house, sometimes helped with grocery shopping, was able to make simple meals for himself with assistance in using the stove, and played basketball at a teen-center, given that those activities occurred within his very supportive home and school environment.  *Id.*  The *Blake R.* court remanded the matter to the SSA so the ALJ could consider the plaintiff's structured living environment and the support he received when determining the RFC:

> Overall, these records indicate that Blake's functional abilities are compromised to a significant degree even in the context of an ongoing support system. Agency policy requires consideration of a claimant's "need for a structured living environment" in determining the RFC. SSR 96-8p. "To find that a claimant has the RFC to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which real

people work in the real world." *Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005) (citations omitted, punctuation altered); SSR 96-8p 1996 WL 374184 ("RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" for "8 hours a day, for 5 days a week, or an equivalent work schedule."). Unfortunately, here the ALJ's opinion does not adequately explain how Blake's structured living environment and the support he received were taken into consideration when determining that his already diminished functioning will not get significantly worse in an ordinary work environment. Remand is necessary for further consideration of this issue.

*Id.* at *6 (cleaned up).

Finally, in *Lillard v. Berryhill*, the court considered the plaintiff's structured settings and supportive environment in the context of the ALJ's analysis of whether the claimant met the Listings. 376 F. Supp. 3d at 983-84. The court found that the ALJ did not properly take into account that the plaintiff could not go out into the community without being accompanied by a family member or his caseworker; the plaintiff met with his caseworker every week, who took him to his appointments; the plaintiff lived with his grandparents and only performed chores at home, and the plaintiff slept during the day because he could not do so at night due to nightmares, depended on others for his meals, and relied on his family to solve basic daily living issues. *Id.* at 983. While the ALJ noted that the plaintiff's ability to play video games, write, read, and draw showed that he could focus and concentrate, the court found that the ALJ failed to recognize that he engaged in these non-interactive activities only at home. *Id.* Because the ALJ failed to consider the extent to which structured settings and supportive environments affected the plaintiff's ability to function as an adult, the court found that substantial evidence did not

support the ALJ's determination that plaintiff's level of functioning did not render him disabled. *Id.* at 984.

In this case, Defendant counters that the record does not support Plaintiff's claim of significant support for daily activities, pointing to the reliance by the ALJ on Plaintiff's report that he could dress himself without difficulty; that he mowed the law, went fishing, played video games, washed dishes, and did his own laundry; that Plaintiff denied needing any help with personal hygiene, enjoyed playing neighborhood basketball and football games, sometimes prepared meals, assisted with chores around the house, and did not need help with those activities (except when cleaning his room). (Dkt. 15 at 11-12.) According to Defendant, such evidence undermines Plaintiff's argument that he required significant family support in a structured living environment, and these reported activities support the ALJ's RFC finding, which included in part, that Plaintiff could perform unskilled work with some social interaction limitations. (*Id.* at 12.)

Unlike the claimant in *Nowling*, Plaintiff here does not have a serious physical condition—a seizure-like disorder—that requires family members to provide assistance on a regular basis, notwithstanding an ability to perform certain daily activities. Further, this case is distinguishable from *Blake R.*, as in that case the plaintiff needed intensive supervision as a student by a paraprofessional and by his mother as his legal guardian once he turned 18. While there is evidence that Plaintiff received special services or had an IEP at some points while in school, there is simply no evidence that he needed intensive one-to-one attention so he could complete his work or not be nuisance to others. Indeed, Plaintiff represented that he related adequately as to most of his teachers (R.

711), and claimed that he did not have any problems getting along with his family or with others (R. 568). There is also no evidence that his father or any other person has been appointed as a legal guardian for Plaintiff. Moreover, unlike the claimant in *Blake R.*, Plaintiff here does not have any issues with maintaining his personal hygiene, let alone the serious inability to properly control or deal with his continence without the level of assistance that was evident in *Blake R.* (which would naturally impede a person's ability to function to work outside the home without structural supports).

In addition, unlike the claimant in *Lillard*, who could not go out into the community without being accompanied by a family member or his caseworker (including to his appointments), the evidence in the record here is that Plaintiff was able to seek treatment in the emergency room and sign off on the treatment without assistance from a family member, including visits for: an injury involving helping a friend (not a family member) on a farm using a jackhammer; back pain and cloudy urine; wrist pain related to Plaintiff showing his younger brother some boxing moves; and a complaint of foot pain with the movement of his neck. (*See*, *e.g.*, R. 767-72, 800-04, 808-12, 846-51.) Although it appears that Plaintiff's parent attended one emergency room visit (R. 762) and mental health appointments, there appears to be evidence in the record that Plaintiff was able at times to care for his own medical needs. Further, there is evidence that Plaintiff was able to engage in a number of activities outside of the house without supervision, unlike the plaintiff in *Lillard*, such as fishing, playing neighborhood basketball and football, and helping non-family member with jackhammering. (R. 563, 712, 767, 819.) More importantly, unlike the plaintiff in *Lillard*, there is no evidence that

Plaintiff needs to sleep during the day and this need was acknowledged and accommodated by family.

In sum, while this is a close call, the Court finds that substantial evidence in the record as whole supports the conservative RFC assessed by the ALJ, and that, notwithstanding the general involvement of Plaintiff's family in his activities, no additional limitations in the form of a structured living environment are required. *See Lucas T. S. v. O'Malley*, No. 23-CV-0663 (JRT/DLM), 2024 WL 365320, at *7 (D. Minn. Jan. 8, 2024), *R. & R. adopted sub nom.*, 2024 WL 364531 (D. Minn. Jan. 31, 2024); *see Nash*, 907 F.3d at 1089 (Where "substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome.").

## B.    Plaintiff's RFC With Respect to Training

Plaintiff's final argument is that even assuming that he is capable of "occasional" contact with others in a work setting, the ALJ failed to explain how such an individual would succeed during a training period when more than "occasional" contact with others is required.  (Dkt. 10 at 21-22.)  According to Plaintiff, if a claimant could not successfully complete training in a probationary period with only "occasional" contact with a supervisor, they would be precluded from performing work in the jobs identified by the Commissioner.  (*Id.* at 22.)

As a starting point, Plaintiff does not fully explain why the kitchen helper, laundry worker, and the stores laborer positions require training that necessitates more than occasional contact with others.  The VE's testimony does not support this argument, and

Plaintiff has not identified any evidence that does. In general, the Court need not consider an "undeveloped argument" nor divine a basis for it. *See Aulston v. Astrue*, 277 F. App'x 663, 664 (8th Cir. 2008) (citation omitted); *see also Patricia M. v. Saul*, No. 18-CV-3462 (DSD/HB), 2020 WL 3633218, at *9 (D. Minn. Feb. 5, 2020) ("Plaintiff does not specify the aspects of the ALJ's analysis with which she disagrees or otherwise identify the facts to support her claim. Defendant characterizes this argument as an "undeveloped argument," and the Court agrees. The Court is not required to address such undeveloped arguments[.]"), *R. & R. adopted sub nom.*, 2020 WL 1951748 (D. Minn. Apr. 23, 2020); *Camie P. v. Berryhill*, No. 18-CV-1401 (ECW), 2019 WL 2644256, at *5 n.3 (D. Minn. June 27, 2019) ("Plaintiff's argument that the RFC should be reassessed, with no explanation as to why a reassessment is necessary, is an undeveloped argument.) (citation omitted); *Ollila v. Astrue*, No. 09-CV-3394 JNE-AJB, 2011 WL 589037, at *11 (D. Minn. Jan. 13, 2011) (refusing to consider argument where the plaintiff failed to connect the facts of the case to the asserted error), *R. & R. adopted*, 2011 WL 589588 (D. Minn. Feb. 10, 2011). Plaintiff's argument fails on this basis alone.

To the extent that Plaintiff is relying on his counsel's questioning of the VE about the necessity of Plaintiff "shadowing" someone to learn those three positions, Plaintiff ignores that VE's testimony that such training would not necessarily entail more than occasional exposure to other persons. (R. 60-61.) Moreover, several courts have rejected Plaintiff's theory:

> To the extent Plaintiff suggests that interaction requirements during a probationary training period may exceed occasional, courts have rejected this theory. *See e.g., Rebecca L. v. Comm'r of oc. Sec.*, 617 F. Supp. 3d 256, 273

(D.N.J. 2022) (citations omitted). Here, the VE acknowledged that interaction levels during training may exceed occasional, but this does not create an apparent conflict under SSR 24-3p, which clarifies that the DOT reflects "maximum requirements of occupations as generally performed." The VE confirmed that her testimony was consistent with the DOT, except where she relied on her experience, and Plaintiff did not challenge that assertion. Because the potential for elevated interaction is limited to an initial probationary period and does not conflict with the DOT's characterization of the job as generally performed, no further explanation was required from the ALJ.

*Robin S., v. Comm'r of Social Security*, No. 24-CV-06904, 2025 WL 1431084, at *10 (D.N.J. May 19, 2025); *see also Suchini v. Comm'r of Soc. Sec.*, No. 8:24-CV-01467-KCD, 2025 WL 913765, at *2-3 (M.D. Fla. Mar. 26, 2025) ("The VE's testimony that a supervisor might give extra instructions for "maybe a week" does not undermine the ALJ's conclusion that Suchini could perform work where such interaction was only occasional.") (collecting cases).  The Court concludes that Plaintiff's "training" argument does not provide a basis for reversal or remand.

* * *

For all these reasons, the Court recommends denial of Plaintiff's request for benefits or remand of the Commissioner's decision.

## V.    RECOMMENDATION

Based on the above, and on the files, records, and proceedings herein, **IT IS RECOMMENDED** that:

1.    Plaintiff's request for reversal or remand of the Commissioner's decision (Dkt. 10) be **DENIED**;

2.      The Commissioner's request for that the Complaint be dismissed (Dkt. 15)

be **GRANTED**; and

3.      The Complaint (Dkt. 1) be **DISMISSED WITH PREJUDICE**.


DATED:  June 11, 2025                    *s/Elizabeth Cowan Wright*
                                         ELIZABETH COWAN WRIGHT
                                         United States Magistrate Judge


## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).